We have four cases this morning, and they're all labeled Paice v. Ford Motor Company. They involve at least four separate patents, and therefore we'll consider them separately. Although the first two are quite similar and the second two are quite similar. So the second and the fourth probably will have a lot of overlap, and you need to repeat the same thing multiple times. But I'll let you go at your own pace. In any event, the first case is Paice v. Ford Motor Company, 2017-12-63, plus about eight or nine others. Mr. Cordell. Thank you, Your Honor. Ruffin Cordell for the appellant. And if I could ask just one follow-up on the Court's last point. Given the similarity in the first two appeals, would it be acceptable to the Court that we argue them together? I've conferred with Mr. Moore, and he thought that might be a good approach. That's fine. Thank you. May it please the Court. I'd like to begin with the comparison between road load and the maximum torque output of the engine that's required by the claims. The Board found as a matter of claim construction that a road load to MTO, or maximum torque output comparison, is required. So we see that in Appendix 13 where they said claims, for example, 161 and 215, each require a comparison of road load to a maximum torque output MTO. Because of the recitation, quote, when the torque RL required to do so is more than MTO, close quote. Petitioner has not advanced any cogent reasoning why no such comparison is required by the claims. The problem for Ford in this case is that they treated this purely as a matter of claim construction. They took the position before the Board and in their petition that no such comparison was required. And then when challenged at the actual what they call a trial at the PTAB, counsel for Ford admitted that they had not provided any evidence under any alternative construction. And you'll find that at Appendix 16, 525, where, and I'm sorry, the MISC site is Appendix 8001. 8001 is the site. And that comes from page 42 of our brief where Mr. Angilari on behalf of Ford admitted that there was nothing in the petition to address any comparison between road load and MTO. So the record is devoid of any evidence, not just substantial evidence, to support the finding of the PTAB with respect to this comparison requirement that the PTAB found as a matter of claim construction was required by the patents. But it's not just their admission that it wasn't there. I don't think they can do it. So I think when we turn to the factual record itself, there is no support in the prior art and the Ibaraki reference for- Why doesn't Ibaraki in fact show such a comparison? Because what Ibaraki shows us is in fact a power-based system for which the torques widely vary. So the best way to approach this, I believe, is to look at what a torque curve for an engine actually looks like. And so at page 44 of the blue brief, we set forth a curve, and that curve- in any kind of step-by-step way, how the controller there makes its determination. And I'm obviously thinking about Figure 11, where on the topographical- the planar chart you are with the B and C partial curves of power constants, and you're just- You could show that in a different way. And column 20 of Ibaraki says you switch certain things when you cross the line from across B and across C, and those are in fact power constants. Does Ibaraki say- and this is central, I think, to what the board said, and I think to Ford's argument- that for a given speed, figuring out where you are requires you to figure out what the torque is. And I wonder if Ibaraki teaches anything about whether the controller takes the speed of the vehicle and then finds the torque, and what more detail there is. Is that- I hope that's semi-comprehensive. No, I absolutely understand your question, Your Honor. We've just been through a trial where we talked about exactly that issue, because it turns out there are systems- it turns out actually made by Ford- where they decompose or deconstruct power into speed and torque components. And so that is something that could have happened, but that's not what we see in Ibaraki. So what- you asked about the step-by-step comparison. The best example of it is actually in figure 10. And so in our gray brief at page 5, we do a side-by-side of figures 10 and 11. And figure 10 is an algorithm. It's a flow chart, and it shows us exactly what Ibaraki does in order to make these mode-changing decisions. And you can see the diamonds that are set forth in figure 10 are the actual comparison or decision points in the control structure. So, for example- I guess I'm kind of at an earlier stage on figure 10, and I guess I'm kind of interested in what- I can't claim to have read all of the columns of Ibaraki. So, tell me about reading input signals, which is Q1, and calculating required power level, PO. So I confess that I did not prepare on exactly what the input signals were for Ibaraki, but what I do know is that we have studied it very carefully to look for any place where they might have decomposed power into torque and speed components, and it's not there. But there has to be an awareness of the torque in Ibaraki, right? Well, it could be, except they don't ever say that. So what they say instead is that they operate based on power. The annotations that Ford relies on, this vertical line they draw where they say it's a single speed, that was something added wholly by the Ford experts. So that is nowhere in the reference. What the reference gives us is that this is a constant power system, and a constant power system would be absolutely distinguished from the claims in this case. So something that operates on a constant power, every time the power demanded by the system exceeds 10 kilowatts, you switch to the engine. And if that's what we're talking about here, that is wholly different from these claims. And that's what Ibaraki shows. It could be, however, that you have a system where it is monitoring power, and it's also monitoring speed, and the two of those together give you the torque. That is a different system, and we have no level of detail that would reflect that in Ibaraki. Ibaraki is just silent. It tells us power, power, power. In one of our previous cases, I don't remember which one, maybe in a discussion related to Bumby, we talked about torque being derived from power there, and you're saying that Ibaraki is not that. That's right. And you might not agree with the earlier one. Ibaraki is not that. Ibaraki speaks only of power. And so the burden becomes incumbent upon Ford to show us the detail where Ibaraki is deconstructing power somehow. But the board's finding was essentially that the calculation based on power necessarily implies a determination of torque. And where I would depart from them is that you need a calculation based on power with the knowledge of speed. If you have both of those, then you do have torque, and we've said that over and over again, and that is the way these systems operate. But if all you have is power, then you have a power-based system. If you look at Figure 11 of Ibaraki, what you see is a constant power curve. You see a curve that is hyperbolic, and we actually set forth in our blue brief at 39 various cases of a single power. I think we did 10.5 kilowatts, and we calculated the various points that would fall within the region that Ibaraki talks about. That is a constant power system. And again, it could be that the control system is more sophisticated in real life, but we just don't have that detail in Ibaraki. And did Dr. Davis talk at all about the way that decision-making is made in Ibaraki to take account of torque, either in calculating power in the first place or in deriving torque after an independent power determination? What he talked about is assuming the speed. So he injected the speed, the knowledge of the speed, into the equation. And if you recall his drawings, he would draw a vertical line and say for a single speed, as the power requirements change, what that really means is that the torque is changing because he drew a single line and maintained speed and posited that that would be an example of Ibaraki changing modes because of a change in the torque. But that's just a factual manipulation of the reference. That doesn't show us that Ibaraki itself was taking torque into account, which is what they must show. But if Ibaraki is silent about how it does the power discernment, whether starting with speed and separate independent determination for speed and torque and calculating power or in some other way, why is it not a factual question to which Dr. Davis' testimony is highly relevant and perhaps constitutes substantial evidence that a skilled artisan would, in fact, if not read into Ibaraki this, at least find it obvious from Ibaraki that torque is being used essentially going up and down a vertical line with speed as a constant. So I would have two responses. First, the expert may not, see Dixit, just inject facts into the reference. So he needs some foundation to draw that conclusion. And had he articulated that, we might be having a different debate. But then number two, and perhaps most importantly, the board should have articulated that that was the foundation of their analysis under Chenery. So we need to review that decision to see exactly what it is they relied upon and be able to test the validity of the conclusions that they drew. And we don't have that here. So again, the Ibaraki reference tells us power, power, power. And that is a substantially different concept. And if I can return to the comparison to MTO, because even if you agree that somehow Dr. Davis made out torque, he never addresses this comparison between the road load and MTO. That fundamental comparison is nowhere there. Well, he does. I mean, he provides pretty substantial testimony on that point. I mean, putting aside the question of whether his testimony with respect to whether it discloses torque is correct, doesn't he provide a lot of testimony about how that calculation to MTO is done or necessarily done? He just assumes that it must be done because the engine and the motor both operate at high levels. And so in his view, it must be in there someplace. However, there are a couple of fundamental problems here. Remember the admission they make at Appendix 8001 that Ford never put in any evidence as to that comparison. Now, they attempted to backfill that in reply using Dr. Davis' supposition about what must have been done. But again, that's not permitted. The PTAB has rules. They're supposed to constrain themselves to the evidence put before them. And the PTAB says that that was a matter of claim construction that Ford lost. Ford took the position that no such comparison was required. When the PTAB ruled against them on that, they simply didn't have any evidence to support that comparison. Well, but the board seemed to believe that his testimony, whether you call it backfilling or not, but that his testimony was sufficient to establish the existence of that comparison. I guess I would challenge Mr. Moore when he stands up here to point out exactly what that evidence is because as I read Dr. Davis' testimony, what he says is the system operates with both the engine and the motor operating at high torque levels. Therefore, the comparison must be there. But imagine a system where the engine and the motor are operating at all times. They're always on. That would be true, and that doesn't satisfy the comparison that the board said was required. So fundamentally, Ford lacks any evidence to show that comparison. Can I check on one thing? The little horizontal line on Figure 11 at the extremely low speeds, am I right that the board made reference to that just once in rejecting one of your proposed illustrations as a kind of unwarranted modification of Figure 11 but didn't separately, didn't rely on that little horizontal line for its fundamental determination that this is ultimately or at least partly about torque rather than power? I think that's right. I think that what they did ultimately, there was some debate about whether it should be vehicle speed or engine speed that's evaluated. The engine is a torque-based component. Its torque map as shown, it's the example of the curve at appendix 16, 492, shows a flat profile, and that's really over engine speed because that's what you're focused on. Ford, in reply, made arguments about a transmission and attempted to refit the curves, very complicated analysis, but the board relied on none of that, absolutely none of that. So the claims that the 634 recite separate, different speeds for separate set points? They do not. They recite different modes based on torque levels, and so speed really forms no part of the 634 claims. They really are a torque-based analysis. And if I could follow up on that, not only do they need to show us a comparison between road load and MTO, but remember there are other claims in the pattern that require quantitative comparisons between road load and MTO. So for example, claim 161 requires that the set point be substantially less than MTO, and the board construed that to mean 70%, something below 70%. The PTAB then allowed Ford to rely on the pattern figures in Ibaraki, and they sort of eyeballed figure 11 and said, well, you know, it looks like those lines are about maybe half, so that's probably around 70%, below 70%. You take the position that our case law says you can't derive precise values from drawings, but search as I might, I couldn't find a case that applied that expressly to graphs. Well, the Hawkerson case is the one that we rely on, and if you recall, that was about a tennis shoe, and it was the width of the channel in the tennis shoe. And there was a question as to whether the relative width of the channel versus the two wings, I think they call them on the tennis shoe. So there, while it wasn't a graph, it was a continuum. It was the kind of thing that you could eyeball and say that is in fact narrower or wider than the alternative. Here, what we're doing is we have no information about Ibaraki's scale. We don't know if this is logarithmic. We don't know if it's linear. We don't know anything about it. What we know is that you can say one is less than the other. I think that's safe to assume. But the case law that counsels against reliance on the figures understands the way patent figures are drawn. They're often drawn by draftsmen that are trying to illustrate a concept, and they're not meant to be precise. But I'm correct. You're asking us to take Hawkerson one step farther. I think that's fair. I think that's fair, but not far. I can't say that as I stand here, I can recall exactly Your Honor's question coming up, that looking at a figure and deducing from a graph exactly what the numbers are. That is fair. Since we've combined the cases, you have 13 and a half minutes to continue. Okay. So don't worry about the red light. Thank you, Your Honor. Unless you get to minus 15. Well, and I did reserve some rebuttals, so maybe I should stop at That's fine. five minutes into the minus. That will be fine. Thank you. So if I could then touch on taking this a step further, because there are also claims that, say, the set point has to be less than 20% of MTO. So, for example, Claim 13, Claims 13 and 15, actually take it beyond the 70% down to 20%. So now we're looking at Figure 11, and we're starting to I have no idea how you would reach this conclusion. I mean, we're not only decomposing the distances that are shown in the figure, but we're having to do it at precision levels that simply cannot be found in that kind of a reference. So Claims 13 and 15 stand on their own in that you now have to show a 20% less than MTO threshold. And that is simply, again, nowhere in the Ibaraki reference. And there's nothing in Ibaraki to give us textual support to guide one of ordinary skill as they're doing this analysis. So we're really doing it in whole cloth. If I could touch on Claim 25 for a moment, this is actually an important aspect of the invention. What Claim 25 says is that the engine torque in the system is not to be greater than the two electric motor torques combined. So the idea is that the size of the engine and the size of the electric motors in relative comparison is an important concept. And it's actually critically important in the field of hybrids because you could put a very large engine into the system, but it's heavy and it requires, it's very inefficient to haul around as you move. And so the choice of the engine has an impact in two ways. Number one, the efficiency of the overall system just from having to move it around. But number two, recall that the torque produced by the engine is key here. We want the torque to be produced at a level that matches the set points that we expect for the overall system. So we can't simply gloss over things like, for example, Claim 25. It's a critical element in the overall invention. And what we have on the prior art side from Ford is they simply look at Ibaraki and they say, well, you can pick whatever engines you want, and that may be true, but it guides nobody in the process of actually choosing those engines. So now they look at Kawakatsu. And they look to Kawakatsu, and at page 60 of the blue brief, we have a side-by-side, and we show Ibaraki's torque curve, and it tells you you need to use things at different times, and then we have Kawakatsu. The problem that Ford faces is that they are absolutely 180 degrees out of phase. So what Ibaraki says is use the biggest engine you can find because you want to be able to operate the engine at very high torque levels. You want to be able to use it extensively. Kawakatsu, for its part, says just the opposite. It says use a very, very small engine. And so if you look at the figure we've reproduced at page 60 of the blue brief, regions 4 and 5 are the only times that Kawakatsu tells you to use your engine. It's a very small engine, and it's one that is used to operate only in a very, very small region of speeds and power demands. The little circles at 4 and 5. And there is no evidence whatsoever in this record about how you can combine those two teachings. You've got Ibaraki on the one hand saying use a very, very large engine. You have Kawakatsu saying use a very, very small engine. And the claims say there's a very precise relationship between the size of the engine and the electric motors. And that's completely missing from this record. And then finally, I'll take one foray into the interesting world of FUDS, which is the Federal Urban Driving Cycle. And there are a number of claims that talk about using, again, the sizing of components is critical to this invention. The sizing of the components, for example, in Claim 240, says that the electric motor must be sufficiently powerful to perform the FUDS cycle without torque from the engine. So in Claim 25, we had the relationship between the size of the engine and the size of the electric motors. And now in, for example, Claim 240, although there are others, we're focused on exactly what that electric motor needs to be able to do. And the Federal Urban Driving Cycle is a published test where people drive a car around on a track and you get certain results based on its performance and its emissions and its mileage, all the things that we track with vehicles. And what Dr. Severinsky discovered is that sizing that motor is important because in order to achieve efficiency, you need to have a motor that is sufficiently powerful to accomplish the FUDS test on its own. So it's a very straightforward kind of test. The question you have to ask yourself is, can I do all the things that FUDS requires, drive a certain speed on a straightaway, do a turn, all the things that are required, and I need to be able to do that using the electric motor alone. On the prior art side, we have a Verrocki that says nothing about this. It just tells you to use the electric motor for certain power levels, the engine for other power levels. And then you have the SUGA reference, which is just a generic testing approach. You can do any test using the SUGA reference. It just tells you how to drive the components and monitor them so that you can decide whether or not you've met a certain test requirement or not. Nothing tells us about how to go ahead and size that motor. Again, the critical distinction that has to be made is you're achieving the efficiencies as I mentioned using these two references. Can I take you back to one point I want to get a little bit clearer about? Your point about the absence of evidence of a comparison, I guess for going into the B to C zone to the MTO. Is that an independent point of your argument that Ibaraki is – is that independent of your point that Ibaraki is all about power and not about torque? Yes. Okay. And where exactly is the board's discussion of this claim element? This is the numbers you give to this claim element. But where is the board's discussion of the point? I believe it's at Appendix 13, Your Honor. And this is just an example. So in the middle paragraph, for similar reasons claims 161 and 215 each require a comparison of road load to maximum torque output because of the recitation when the torque RL required to do so is more than the MTO. Petitioner has not advanced any cogent reasoning why no such comparison is required by the claims. We determine that the claims require a comparison of road load RL to a set point SP and also to a maximum torque output MTO. Okay. So that's a claim construction. Yes. And where in the opinion does the board address whether that comparison is either found in or obvious from Ibaraki? So they attempt to at Appendix 23. Okay. And I understood this to be a way of saying essentially the Figure 11 plus the description of Figure 11 in Column 20 of Ibaraki shows a shift being made as you cross this line and as long as we know something about the line bearing on its relation to MTO, it is effectively doing the comparison. And as I took it, when you advance a few pages to 27, you get a board's response to your argument, which again I take it is the board saying, you're asking for something more than is necessary when you ask for a comparison. Ibaraki shows a transitioning based on something that we have separately tied to MTO. I think that's right, except that what they do is ultimately if you look at Page 29, they say that our argument is that the petitioner, Ford, never actually makes the comparison that they say is required by the claims. So I'm reading from the first full paragraph. But then they say, but petitioner does not assert that Ibaraki 882 mentions or discusses MTO. And that is a true statement. And that's the fatal flaw in what Ford has done here and what the board has done here. They need to evaluate that MTO. They need to fix the MTO in the Ibaraki reference and then show that that comparison is made. And if I could take us to Appendix 8000. 8001. I apologize, I have too many appendices. Did the board cite these slides 15 and 16? This is, I guess, some kind of reply material that I think Mr. Angiolari is discussing on a point, on this point. He did, but if we can go just back a little bit to Page 8001 where he says, can you go to slide, I don't think it's in the petition. So he makes a candid admission there that, in fact, they didn't ever make that comparison. And the slides, I think, were demonstratives that he prepared for the hearing or for the trial, I guess they call it. But they cite to his testimony, and I mean, going back to your Page 29, they do cite to Dr. Davis' testimony. And they basically say that even if Ibaraki alone does not describe it explicitly in terms of operating the engine motor above the MTO, they actually, that one of Stilniar would have understood that. Why isn't that enough? Well, again, they need some foundation to make that statement. So what's shown in Figure 11 of Ibaraki are simply regions at which they claim that certain transitions are made. But you don't know whether those are completely above or completely below MTO. If you look at the comparison at Appendix 16.525 that our expert did, you can see the disparity between MTO and a constant power curve. So, I'm sorry, 16.492 is the best, is the best place. Because we've juxtaposed a torque curve, which is a fairly flat curve over a range of speeds, against a constant power curve that's shown in Ibaraki. So there's just no information about the relationship of that constant power curve to MTO. MTO is constant because it's dictated, well, it's not completely constant because at low speeds, much of the torque produced by the engine is consumed by the engine as it's pumping its pistons. But the MTO is really dictated by the size of the pistons, the displacement of the engine, whether it's normally aspirated, the kind of fuel that goes into it. Those are the things that dictate the torque. The power is something completely different. That has to do with how fast it's running and what else is happening with it. But the torque is a rating on the engine. And the maximum torque output is a rating on the engine. Ibaraki tells you nothing about that. And, in fact, what it shows is operation over a wide variety of torques. You can look at the vertical axis on figure 11 and see that. Well, this goes back, though, to your primary argument that Ibaraki doesn't disclose a torque-based system. But assuming that it does, then couldn't they accept Dr. Davis' testimony with respect to how that would operate? No, because he didn't tell us what the maximum torque output was in Ibaraki. We have nothing to compare it to. We have no mechanism to compare it. But what we have in Ibaraki is a range of powers. And I'm sure there is an MTO for the Ibaraki engine someplace. But the fact of the matter is we've got to know what it is, and we have to effect a comparison to it. Instead, we don't know whether the MTO is anywhere in this region or nowhere in this region. It could be that the engine in Ibaraki is operating 100 percent of the time below its MTO, that the whole system is operating below it. The engine obviously is. But the whole system is 100 percent below the MTO. They're reserving the engine because they don't want to, perhaps for efficiency or emissions purposes, they're not running the engine at its highest levels. Thank you, Mr. Cordell. You've had a time equal to the two cases. We'll give you five minutes for a vote. Thank you. Mr. Moore. And you've got 30 minutes, Mr. Walker. Thank you, Your Honor. Let's start with the argument made by my friend that Ibaraki doesn't disclose a torque-based control system. Ibaraki discloses a torque-based control system in several places, including figure 11, figure 5, figure 10, and Ford's expert testimony speaks to this at length. In figure 11, Ibaraki describes figure 11 as representing a predetermined relationship between the vehicle drive torque and speed and the operating mode. Ibaraki expressly says you've defined a predetermined relationship between torque and the operating modes. That's a torque-based system. But the figures, unlike the Bumby references, Ibaraki's figure 11 shows that at least it appears from the curves that torque is not constant. Torque is not constant. Torque depends on how much the driver presses the accelerator pedal, how much torque you want from the car. But if it's not being held constant, then you're not deriving the vehicle mode from the torque. You are, because you know a given speed, and at a given speed, when a driver demands torque from the accelerator pedal, that determines where on that y-axis the vehicle drive torque you are. But it's a power comparison to a set point, right? No, it's not. That's what figure 11 shows. Figure 11 shows that what you do is a given speed. I always know the speed my car is driving at. And at a given speed, I then look at how much torque is being requested by the driver, and I compare that at that given point to where I am relative to boundary B or boundary C, and I determine which operating mode it is. What's the basis for keeping the speed constant? I mean, that's how your expert derived these calculations. He assumed the speed was being kept at a constant level, correct? Well, because you know the speed at the time you're hitting the gas pedal. That's the one given you have in this equation, is you know the speed of the vehicle at the time torque's being demanded. So now I need to determine at this given time, where I'm driving 30 miles an hour, how much more or less torque is required, and therefore which operating mode the car should operate in. What material in Ibaraki, and I'm going to just try to ask what I think you heard. That's my attempt and opening question to Mr. Cordell. What in Ibaraki describes the process by which this power is determined to figure out where you are on figure 11? The best site would be column 20, line 58, through line 21, line 2. Right, but that seems, I mean, I don't see in there anything that is saying, you know your speed, now figure out largely from something or other having to do with the gas pedal. Even this is somewhat mysterious. I gather it's a change in the gas pedal position, but not the position itself. But you have built your whole argument, and the board did too, I think, on this idea that there's a sequence in Ibaraki starting with a point on the x-axis and then figuring out where you're going to go on torque. And that's what I'm trying to understand, whether that is actually described in Ibaraki. All column 20 says is here's a nice graphical representation of power. We're going to do it instead of having a three-dimensional graph, we're going to have a two-dimensional one, and so we will represent it as a fixed power curve multiplying x times y. But it's just a representation. Well, there's three answers to that statement. First, the part is nothing in the claims says you can't consider speed. The claims require that you use torque, but if you use speed too, that's fine. These are comprising claims. So the fact that you use torque and speed doesn't change the fact that that describes the claims. Second, where in Ibaraki it describes that, it's when it's talking about the drive source selector selecting based on the vehicle running condition as represented by torque and speed. As represented. And the problem I guess I'm having is I'm having a little hard time getting beyond this language as represented as meaning something other than here's a convenient graphical representation of power, but not as a descriptor of the step-by-step process the controller is using. Well, see, that's what this is describing. This is describing the controller, and that's what Ford's expert does. That's why this statement provides part of the substantial evidence that supports the board's decision, is that here it's talking about the vehicle running condition that's considered by the drive source selector. So this is the brain of the car that's making the decision of which operating mode to drive in, and it's doing it based on the vehicle running condition. And what does it consider? It considers the torque and the speed. It expressly says that. Well, except that word consider is not actually, that's what I'm trying to get. I don't get that word consider out of this material. Well, you get that based on what somebody of ordinary skill in the art looking at this record would understand, because it goes back with the description of Figure 11 that you started with, which says that the data map of Figure 11, this is a data map. This is the data map that the drive source selector looks at to make a decision. It's a data map to determine the data you're going to input, the torque and the speed. Look up on your map which operating mode, and how can you do that? Because it describes in column 20, line 49 through 53, that the data map of Figure 11, quote, represents a predetermined relationship between the vehicle drive torque and running speed and the above indicated three driving modes. Right. So you have a predetermined relationship for a particular vehicle between speed and torque, and you get these curves, and the curves are various constants for power, because you're just multiplying them. That's all before anybody has gotten into the vehicle. This is all programmed into the vehicle. And so what I'm trying to figure out is now you're driving along and you do something with the pedal and the controller is going to figure out, am I supposed to have the motor on, the engine on, or both? And what I don't see is any description of how the controller is making that decision. It's just got a curve map in its memory. It's a data map, and you look at the two inputs to determine where you are in the data map. That's what I'm not getting. I'm not getting anything in here that says the controller looks at the two inputs. The drive source selector is the computer, and what it looks at is this data map. All it takes is my two inputs, my torque and my speed, and it looks at its programmed data map to find a point to make a determination. But they're looking at those two inputs together, right? So you could end up with a setpoint determination or a power mode determination at high speed and low torque, or low speed and high torque, right? No, because it's not a power-based system. We know figure 11 is not power-based, because if you look at that boundary B, it starts off with a constant torque. And when it starts off with a constant torque, you've got a constant torque and a changing speed, an increasing speed. If it was a power curve, power equals torque times speed. So if torque is constant and speed is increasing, power would have to increase, but the curve doesn't. The curve stays flat even though torque is constant and speed is changing, so it must be a torque-based curve. Am I right the board did not rely for this crucial piece of its analysis on that little piece, the little horizontal line? I'm not sure if they explicitly cited to that point, but there was certainly substantial evidence in the record to support it, and I believe it was part of the record that they considered. Right, so one reason it might not have relied on it is that I'm not sure that Ibaraki tells us anything about what is happening with respect to propulsion source choice anywhere north of the outer edges of this whole curve, north of the horizontal line, north of the two squiggly lines, north east of the outer curvy line. It seems to me that there's no information about that, and so the only thing we know is what's happening inside that outline. But I did not see anything where the board said, this horizontal piece tells us something about the mechanism of action that is taught in Ibaraki. The board did not expressly state that, but the board considered it part of the record when the board found that Ibaraki teaches a torque-based control system, and it found it based on the substantial evidence of the descriptions of figures 11 and figure 5 in Ibaraki, plus the extensive Ford expert testimony on this point. Can I take you back to where Mr. Cordell started, which is the point that he made that the board, in its own claim construction, said that the road load MTO comparison limitation opposes a cause and effect relationship, and then the board sort of deviated from that very same claim construction in its analysis. We don't dispute that there's a comparison required between road load and MTO, and there's no dispute on Ford's part. But a cause and effect, you don't dispute there's a cause and effect relationship? No, that we have to compare road load to the maximum torque output to determine the operating mode of the engine. There's no dispute about that, and the board expressly found that, and Ford's expert expressly opined to that. There was a lot of argument by my friend suggesting Ford thought it was only a temporal limitation. That's not Ford's position at all. That was a mis- Well, you didn't respond to this point in the brief, so tell me exactly what Ford's position is on that. Ford's position is that Ibaraki clearly teaches you compare the vehicle drive torque, the road load, at a given speed to the boundaries B and boundary C. And when you make that comparison, and the board expressly found that there's a comparison there, that when you make the comparison to boundary C, you're comparing it to road load, to maximum torque output. Because boundary C, somebody of ordinary skill in the art would understand, can be the maximum torque output of the engine. Because the region between boundary B and boundary C, at the boundary B is where the engine starts to operate all by itself. And when it gets to boundary C, that's where the engine no longer operates by itself. So that alone teaches somebody of ordinary skill in the art, well, maybe that's where the engine can't operate anymore, the maximum torque output, that can be it. Further supporting that is, above boundary C, now if I need more torque, I've used the engine alone for this entire range from B to C. But once I hit C and I need more torque, I've got to add in the motor. Further teaching somebody of ordinary skill in the art, as Ford's expert, Dr. Davis testified, and as the board gave substantial weight, I know boundary C can be the maximum torque output of the vehicle. And that's where the board considered the express disclosures of Ibaraki, figure 11, the extensive Ford testimony from Ford's expert on this, and made a credibility finding in favor of Ford's expert over Pace's expert, giving substantial weight to the testimony of Ford's expert. I should probably know this by now, but maximum torque output is of the gasoline engine, not of the combination. Correct. On this substantially less than limitation, I was discussing the extension of Hockerson. I mean, it is true, is it not, that your expert did derive precise numerical values from the graphs? Well, there's three ways that substantially less than the maximum torque output is calculated. First, it's based on figure 5, and then it's based on interpreting figure 5 in view of the Mazding figure 1 reference. And he does go through and come to an exact number, a 33% of MTO or a 36% of MTO. But first, you don't even need to get into the graphs because most of the determination is based on math and expressly disclosed numbers. For example, if you take figure 5 of Ibaraki, you see at the top there's a hatched region, and that's where the engine operates most fuel efficiently. And you can see that's at a very high torque level. And then you see under that, and so you know if that hatched region is where your engine operates most efficiently. Maximum torque output is higher than that. It doesn't show it, but it's higher than the maximum fuel efficiency of the engine. Then you see a line at 70%, 0.7. That's 70% of the fuel consumption efficiency. So that's 30% below the maximum efficiency of the engine, but even further below the maximum torque output. And so you know based on that boundary that it's substantially less than MTO. And here we're talking about a limitation that my friend admitted is between 0 and 70% of MTO. It is a very broad limitation. So the only question here is whether a person of ordinary skill in the art,  the maximum fuel efficiency of the engine, but even further below the maximum torque output, would know that that threshold could be within 0 or 70% of MTO. There's no precision to that limitation substantially less than. In fact, it's 70% of all operating points. Your friend on the other side is going to say that you basically improperly mix and match figures 5 and 11. What's your response to that? Well, they are separate embodiments. Figure 5 is a modification of the first embodiment in Ibaraki, and figure 11 is a second embodiment. But Ibaraki expressly teaches, and this is in the joint appendix, at A2022, and it's column 25, lines 62 through 65, that, quote, the concept of this modification of the first embodiment, and that's talking about figure 5. So that concept in figure 5 is embodied as the data map. I'm sorry, what line are you on? Line 62 through 65. That that concept of this modification of the first embodiment, talking about figure 5, because that whole preceding discussion is figure 5, and how you look at that 70% threshold,  and it says that concept is embodied as the data map shown in figure 11 used in the second embodiment. So Ibaraki expressly teaches that figure 11 can be used and incorporated, and figure 5 can be used and incorporated into figure 11. Can I take you back for a minute to the comparison point and ask you to address the, I guess this was colloquially at the oral argument before the board panel at 801, where it appears one of the members of the panel asks, I'm reading the petition, I'm wondering, that the comparison claim construction you're saying, that we don't need to do a comparison between the road load and the MTO and your attorney, yeah, and seems to be saying, well, we have something in the reply and the slides, if it's not in the petition, it's because we don't believe it's required by the claim. So when you said earlier that Ford's position, it is required by the claim, that suggests that wasn't always Ford's position. I understand that statement was taken out of context, that statement that we've never taken the position that a comparison wasn't required, but I'm not exactly sure on that point. But I know our position here today and our position. Because the board, is it page 23 or whatever the page is we were discussing earlier, in the end of the claim construction section where the board says, petitioner says no comparison is required, we don't see that it's justified that. So the board seemed to think that that wasn't the position. Agreed. So it's not unexpected that something might have been missing from the petition. But Ford's always understood that it was Pace's position that a comparison was required, and I forget exactly what Ford's position was below on this point, but I understand that statement from the oral argument. So what exactly in Ibaraki makes the comparison to an MTO? The drive select controller? No, I don't mean what device. Just describe, do I take it your position is that because the controller, the propulsion source chooser, is looking at this data map and deciding where on it it is, as long as it's picking levels and deciding between whether we're in the B2C region or above the sea, that because MTO is somewhere in there, it is necessarily comparing to an MTO, even though it doesn't actually have an MTO figure in the data map? Because boundary C can be MTO, as found by the board and as testified to by Ford's expert. And the board expressly found that there was a comparison, and that's on page A27. Right, and then I think this is the point where I thought that the board's initial discussion suggested, and I wasn't entirely persuaded by this, I guess, that Ibaraki actually taught it, but then when it came back to the point at page 30, I think, in responding to Pace's argument, it said, well, it was actually obvious over that rather than actually taught in it. I'm not sure it makes any difference. Ford, I believe the board expressly found that somebody of ordinary skill in the art would understand that a comparison occurs. And you can see this if you look at the paragraph on page A27 of the appendix, where it says, quote, a comparison directed to a selected PowerPoint of figure 11 of Ibaraki necessarily makes a comparison with regard to the torque value associated with the selected PowerPoint of the figure. If you go look down in that figure, and what it's talking about is figure 11, the last line on page A27 that goes on to page A28 states, quote, thus a comparison of the vehicle running condition as represented by, and that's what we talked about earlier, as represented by torque and speed is made based on the current vehicle drive torque and speed. And then it goes on to discuss figure 11 more about the drive source-selecting data method. Let me, I guess, just try to clarify what's in my mind and then tell me what's wrong. I agree the board did say that. Suppose I thought that that was, in fact, that was not supported by substantial evidence. Does not the board later, when it goes over 29 to 30, separately say it was an obvious modification? Yes. Okay. Yes. The board finds both. It finds it described and somebody of ordinary skill would understand it, but then goes further to find out that it would be obvious. And it supports that in addition to what I just read to you from Ibaraki, but also based on Ford's expert, Dr. Davis' testimony. Because Ford's expert goes on and explains that it was well-known of somebody of ordinary skill in the art, you could use both the motor and the engine above MTO. And, in fact, that makes sense. I've only got two sources I can get power from, motor and engine. And if one of those can't provide the performance I want, the torque required, I can take 1 plus 1 is 2. I can just add them together to get even more torque and more performance. And I'd like to just also make the point that with regard to Ibaraki and its disclosure of a torque-based set point, this issue was effectively already considered in the earlier 2034 appeal. Because in the earlier 2034 appeal, the Tabita reference was considered. If you looked at the Tabita reference, Ibaraki was also an inventor on that in the 2034 appeal. In this appeal, if you look at the Ibaraki patent, Tabita is also an inventor. And that's because they both worked together at Toyota designing the system. But that wasn't the only issue presented in that case, right? I mean, you've got a problem with the Rule 36 having a race-dudicata effect or collateral estoppel effect, don't you? Well, this court considered the fact the issue was raised regarding whether Tabita discloses a torque-based control set point. Our case law says that unless it's absolutely clear that there could be only one basis for the court's determination, that Rule 36s don't have any collateral estoppel effect. But if the court had found that Tabita didn't disclose a torque-based control system, it couldn't have Rule 36ed. So it is absolutely part of the court's decision. Is this the Rule 36 one? This is the Rule 36 one. Because if you look back at the 1416 IPR decision that was Rule 36ed, you can see there where Pace argued Tabita disclosed a power control system, not a torque-based control system. And the court affirmed that decision. And we know because Tabita's Figure 7 is identical to Figure 5 in Ibaraki. They're identical. So that same graph that has the torque on the y-axis and speed on the x-axis and the 70% of fuel efficiency line, that was in Tabita. But Ibaraki has even more disclosure of it than Tabita because it adds Figure 11. And the description says I've got this predetermined relationship between torque and operating mode, and I'm going to have my drive source selector that's going to look at the two inputs, torque and speed, and determine which operating mode. And unless there's any further questions, I'd just like to close with one housekeeping point. My colleague mentioned that there is an ITC action going on that was recently tried. In that ITC action, Pace has taken the position that even though the board ruled for us and the claims are invalid, the ITC is not allowed to consider the invalidity of those decisions. So Pace has taken the position that this supersedes the ITC, considering our invalidity defenses in that, and an ITC decision is expected in the initial termination in March. Thank you, Mr. Moore. Mr. Cordell has five minutes for rebuttal. Thank you, Your Honor. I'd like to begin with the debate over whether line C is MTO. We seem to have had a lot of debate about that, and if I heard Mr. Moore correctly, he is positing the idea that line C is MTO. No, no, I don't think it's what he said. I think what he said and what the board said and I think what Dr. Davis said is that it can be MTO, and even that's not strictly necessary. All that's necessary is that MTO be below the unlabeled line, let's call it D, that sits above B and C. Well, I guess I'd like to address it precisely. So what they have to show us is a comparison. They need to show us a comparison to MTO wherever that is, and what I thought I heard him say is that when it crosses line C, that is the comparison to MTO that occurs, and so one of ordinary skill would either find it or find it obvious then to operate the engine at that level, but that's not what his expert said. So when we look at the actual record, his expert equivocates about whether or not we should be looking at. Ultimately, it'll be Appendix 16165, and you get there by looking at the red brief at page 49 where they cite to this part of Dr. Davis' testimony, and what he says, and this is in the section where he's doing the comparison, the supposed comparison, is that at paragraph 238, it is also my opinion that a person having ordinary skill in the art would have understood the torque point C1 along the predetermined boundary line C would be equal to or possibly less than the maximum torque output at that given vehicle speed. So even Dr. Davis admits that he can't posit the MTO, and recall that there are lots of reasons why a system might operate the engine at different levels. There's no question that the engine operates above the line C. We don't know where MTO is in the Ibaraki reference. They simply don't talk about it. Mr. Moore pointed back at Figure 5, and he said, well, look at Figure 5. There's this .7 there. That's about 70% of the torque produced by the engine, but there's nothing to tie Figure 5 back to Figure 11 or Figure 10. They simply have nothing to do with each other. Mr. Moore pointed at the section of Tabata that talks about it, and I confess I didn't record the site, but it simply doesn't give us any linkage between... Just column 20. Thank you. At 20, 19. I called it Tabata. I meant Ibaraki. We've got... These were Judge O'Malley's questions about the linkage between the two, and what he points to there does make reference to Figure 11, but it doesn't tell us anything about whether the threshold shown in Figure 5 had anything to do with the processes of Figure 10 or the power map that is shown in Figure 11. This is in column 25, I think, is what he was referring to, that Figure 5 describes a modification of something, and then at the bottom, column 62, the concept of the modification. The first embodiment is embodied as the data map shown in Figure 11. It's at the very bottom of the column. Thank you. But again, we don't know where the threshold shown in Figure 11 fall within the torque map of Figure 5. There's nothing to give us any indication that the 0.7 that is shown in the torque map of Figure 5 corresponds to any of the points that we've seen in Figure 11. Your Honor's questions about the relationship between power and speed are spot on. It could be that you have a system that controls with respect to speed, and I need to correct one thing that I did tell Judge O'Malley. There is a claim that depends on speed in the 634. My colleague pointed out it's claim 12, but it's not an issue in this appeal because it does talk about varying the set point with respect to speed. Your Honor, Judge Serrano, you also asked about whether, okay, if we accept all of this, that there's no comparison to MTO, isn't it still obvious? Didn't the Board find that it was still obvious? And I'd have two responses to that. Number one, Chenery tells us they need to explain the basis for their decision. And number two, there needs to be some foundation. There needs to be something in the prior art. Simply a hand wave saying that it's obvious doesn't satisfy the requirements or the rigor that's required for us to get a decision from the PTAB and then come before you all and be able to analyze that decision cogently and rationally. They need to explain that. So a simple broad conclusion that it would have been obvious doesn't meet the dictates of what the law requires, and we simply just don't have it here. And then finally, with respect to Tabata, that is a different reference, and it is a reference that doesn't include Figure 11. We didn't have the MTO issue at issue at all in the 2034 appeal. So they're a whole new set of issues, so Your Honor is exactly correct that there is a collateral effect with respect to any ruling on the Tabata reference. Thank you, Mr. Cordell. We will take these cases under advisement and file the record. This is the series noted as 1263 et al. and 1442 et al.